Richardson, J.
delivered the opinion of the Court.
The will of John James has been set aside by the jury, on account of the supposed undue influence of his son Isaac James; or of fear and constraint of this son.
The formal and legal execution of the will has been well attested and proved by the number of three subscribing witnesses.
The mental sanity of John James is not disputed. On the contrary, his sanity and moral firmness were well proved,— that he often spoke of his will, and his intention not to alter it; and that he did not intend that his daughter Mrs. Woodward should have any part of his estate, — giving for his reason that she had married her husband George Woodward against his wishes, after notice that, if she married him, she should have no part of his estate.
This is a very brief summary of conclusions drawn from the evidence adduced in support of the will. I avoid greater details of the evidence, because the question of the will is again to be submitted to a jury; and I would merely give the reasons that justify the Court for sending the case back for a rehearing; and lay down the established meaning of the “undue influence,” that would destroya testator’s last will.
It will be readily conceded, that a will so authenticated as this cannot be overthrown by less than convincing evidence of undue influence, fear, or constraint, in making such will. I will therefore now give a similar summary drawn from the evidence to prove the supposed undue influence, fear or constraint of the testator’s son Isaac.
John James had but two children — that is the aforesaid Isaac, and a daughter Sarah, who intermarried with George Woodward. The testator bequeathed his whole estate to Isaac.
It appeared from the evidence that Isaac was a very excitable and passionate man, — that he was very apt to threaten vengeance, — that he had great influence with his father,— of which influence instances were proved, — that both the father and son disliked much — if they did not hate, George *554 Woodward. That, there was much inconsistency in the expressions 0f- John James, in speaking both of his daughter and of her husband; but after her marriage, he uniform) y de-cjare¿ tha.t he would leave her nothing; and this appears to have been well understood by his friends and intimates. It equally appeared that Isaac was very willing that his sister should get none of his father’s property.
Thus weighing the evidence for and against the supposed undue influence of Isaac James, it appears to the Court, that although such a will may have been very perverse, and resentful towards Mr. and' Mrs. Woodward, and that Isaac might very possibly have brought about a more liberal'and natural final disposition of the testator’s estate; yet, the only question was — whether this was truly the testator’s last will.
He had the undoubted right to make such a will of his own estate; because, unnatural as it may seem to other men, it appears from the whole evidence, as often declared by the testator, from the execution of the will 17th January, ’48, to the day of his death, 17th March following, — that such was his own determination.
How are. we then to disregard and set it aside 1
We can perceive in the evidence nothing of an “undue influence” on the part of Isaac in, the adopting and executing, such a will. Isaac’s wishes concurred with those, of his father, in excluding his sister. But the evidence of this does no more than introduce the suspicion, that he might possibly have induced his father to make such a will..
But where is the proof of any coercion, or direct and undue influence, to force his own will, in substitution of the real will of his father? We perceive none; unless a concurrence in the wishes of the testator and his son, can amount to undue influence — which would be an absurdity, equal to the. assumption of the argument, that his- daughter’s wishes and interest are to make weight in the same scale,, and render the testator’s own will and legal right as feathers, in the opposite scale. The case is in itself very like that adjudged last May by this Court: I mean the case of John Floyd et al. v. Washington Floyd. In that case the testator Charles Floyd bequeathed his entire estate to his. uncle Washington Floyd— a rich man, and left nothing to his only brother John, or either of his. three sisters, Mrs. Chandler, Mrs. Burton, and Mrs. Williams. In that case “undue influence” was charged against Washington Floyd in like manner as in this case. And the general argument of a perverse and unnatural w-ill, and controlling influence of Washington Floyd, were urged in like manner. But it was plain that it was still the will of Charles' Floyd, and could not be set aside on account of the general influence, &c. of his uncle Washington, and the claims, of his brothers and sisters united. The conclusive re *555 ply was, that every testator settles such sentiments and questions for himself.
As to the meaning of “undue influence,” which is the important consideration and essential point of the whole case, this Court has expounded, and I trust settled it, in several adjudged cases.
In the well considered case of Farr v. Thompson, ex’tr., the Court unanimously laid down the law as follows:— “ Every person of reasonable mind and sane memory may dispose of his property by will. The true inquiry always is, whether there exists the animus testandi; for without that, the instrument purporting to be a wiil is of no effect in law.” “The party, therefore, must be free, and under no compulsion from such threat or violence as may reasonably be supposed to move a constant man.” “ Even in cases of such constraint or fear, if when they are over, the testator confirms the will, it is made good.” “.So likewise, wills procured to be made by artful misrepresentations and fraudulent contrivances, are void. But it is not unlawful for a man, by honest intercessions and modest persuasions to procure a will to be made in his behalf; and according to the ecclesiastical law, importunity, in its legal acceptation, must be such as the testator is too weak to resist, and pressed upon him, even to such a degree as to take away his free agency,” <fcc. <fcc.
“A disposition of property, though ever so capricious or unreasonable, will not be avoided on that ground alone,” <fcc. “ Whatever sort of influence is alleged to avoid a will, must appear to be exerted for the purpose of procuring it” — (the particular will.)
These rules of law have been repeated unanimously, in the case of O’Neall, ext’r. ads. Farr. In that case, the Court adds: — “ Perhaps no man has ever existed who was entirely so self-willed as to be wholly uninfluenced by the opinions and wishes of those with whom he was connected,” &c. “ And it has never been supposed to be essential to a will, that the motives which lead to it should be virtuous, or that the object of the donor’s bounty should be meritorious. But it is essential that it should be the free and voluntary act of a sane mind,” &c. “ If it be in conformity with his wishes, it is emphatically his will, and not the will of another; and we are bound to give it effect, without reference to the motive of the testator, or the unworthiness of the legatee,” (fee.
As to what shall constitute undue influence: — “ According to the authorities, it must be so great as, in some degree, to destroy free agency, <fcc. — And the burden of proof lies upon him who alleges undue influence, in the procurement of the will.”
Precisely the same rules have been reiterated in the recent case of Floyd v. Floyd, (May last.) These unanimous deci *556 sions of our own Courts, one would think, ought to put an enc[ t0 applications to set aside last wills and testaments, on account of the mere general influence of legatees; without any legacy is seldom given at all. Or on account of a supposed perverseness, in the distribution of his property, by the testator. Or on account of his supposed unnatural dislike to his near relations, and the like. . The more especially when we find, that foreign jurists and Judges have very uniformly laid down the same rules, &c.
31 P g ’
From these I will give one instance, from among many:— See Williams on Executors, who says, — “ That the influence to vitiate, must amount to force, and coercion, and destroying free agency,” &c. He says, “ It must not be the mere desire of gratifying the wishes of another. For that would be a strong ground, in support of the testamentary act,” &c.
Under such established rules of law, I would again ask, where is the evidence of any such undue influence exercised by Isaac the son, in bringing about and executing the will of his father, John James?
The Court can perceive nothing of the kind; although Isaac had much influence with his father; and the father’s resentment, towards his daughter, and his preference of his son, were very manifest; and. the will may have concurred with Isaac’s selfish wishes.
I will conclude, therefore, in the words of Judge Earle, in the case of Farr v. Thompson, ex’tr. “ That, to allow this verdict to stand, would bo to let the jury run wild, under the influence of prejudices and feelings, .which, however honorable and praiseworthy, must not be permitted to overthrow the rules of law, or divert the current of justice. The trial by jury would otherwise become an engine of capiicious injustice, instead of the safeguard of property.”
The motion for a new trial is therefore granted.
O’Neall, J. — Evans, J. — Wardlaw, J. — and Frost, J. —concurred.

Motion granted.